862 F.2d 316
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald HOHMAN, Plaintiff-Appellee,
v.
NORFOLK AND WESTERN RAILWAY CO., Defendant-Appellant.
 No. 87-3720.
 United States Court of Appeals, Sixth Circuit.
 Nov. 14, 1988.
 
 Before KRUPANSKY and RALPH B. GUY, Jr., Circuit Judges, RONALD E. MEREDITH, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Donald Hohman, a long-time employee of defendant railroad, was injured in a work-related accident which occurred on April 5, 1984. Hohman subsequently brought an action under the Federal Employees Liability Act (FELA), 45 U.S.C. Sec. 51, et seq. Plaintiff had been injured in the course of moving a 2,700 pound air compressor which was on wheels and was being pushed by plaintiff and two other co-workers. Although the FELA is the only means of redress for a railroad worker against his employer for injuries that are work related, nonetheless, unlike state workers' compensation laws, proving negligence is a prerequisite to recovery. The plaintiff alleged a number of different theories of negligence which will be discussed in more detail later in this opinion. The defendant claims that there was no negligence on its part and, further, that the plaintiff was not only contributorily negligent but also that this contributory negligence was the sole proximate cause of his injury.
 
 
 2
 The case was submitted to a jury and, in answer to written interrogatories, the jury found that the defendant railroad was guilty of negligence which was a proximate cause of plaintiff's injuries and further found that plaintiff was not contributorily negligent. The jury awarded $425,000 in damages which the district court allowed to stand after denying motions for judgment notwithstanding the verdict, new trial, and remittitur.
 
 
 3
 On appeal, the defendant challenges the jury's finding of negligence on its part and no negligence on the part of the plaintiff. Defendant also argues that there was an inadequate evidentiary basis for submitting to the jury the issue of future wage losses and that there was no testimony or evidence on the issue of future pain and suffering sufficient to allow jury consideration. Defendant also claims error in connection with certain statements made by plaintiff's counsel in the rebuttal portion of his closing argument.
 
 
 4
 Upon a review of the record, we find no errors requiring reversal and affirm.
 
 I.
 
 5
 Before discussing the errors alleged by defendant, it is important to note that we do so against the backdrop of the FELA. The FELA, being the sole recourse of a railroad worker for personal injuries sustained in the course of his employment, has evolved into a kind of hybrid personal injury action. It is somewhere between a workers' compensation claim in which the fault of the employer or the negligence of the worker is not a consideration and a regular tort claim for personal injury. Although, unlike the workers' compensation situation, negligence on the part of the employer must be shown, the cases make it clear that the plaintiff need only show the slightest amount of negligence and that this negligence need not be the sole proximate cause of plaintiff's injuries but need only contribute to causing them in a slight manner.[1] Thus, history and precedent compel us to view a plaintiff's claim in FELA cases more indulgently than would be the case in some other type of nonstatutory personal injury tort action. As we stated in Green v. River Terminal Railway Co., 763 F.2d 805, 806 (6th Cir.1985): "In light of the remedial purposes underlying the FELA that Act is to be liberally construed in favor of the injured plaintiff."
 
 II.
 
 6
 The facts underlying this appeal are not complicated and are essentially undisputed. Plaintiff was a member of the Railway's Maintenance of Way Department which involved essentially working on or near the track bed performing manual labor. On the morning of the accident, Hohman reported for duty at the Railway's Blair Yard near Fostoria, Ohio. Hohman was given the responsibilities of an assistant foreman periodically and, on the morning in question, he was instructed by his superior to proceed with four men to the Railway's Narlo (Maple Grove) Yard some twelve miles away. The day's work assignment consisted of repairing the track bed around the railroad switches that were located at the Narlo Yard.
 
 
 7
 In order to assist the men with their work, a compressor was taken to the job site by a truck equipped with a trailer hitch by which the compressor was towed. The compressor was equipped with air hoses which provided pneumatic power to drive spikes into the railroad ties. The particular site at which Hohman and the other men were working was reached by way of a private drive way known as Basic Road which, although owned by an adjacent private industry, was used frequently by members of the public for a variety of purposes. Clair Manecke, the Railway employee who brought the compressor to the site, left it on Basic Road near the Railway right of way near the location of the switches where the men were going to work.
 
 
 8
 As it turned out, the work crew never used the compressor because it cannot be used without a key and none of the men on the job site had the key to the compressor. After the work was completed on the switches, Hohman, who was in charge of the work crew, decided that, since they were going to another job site, the compressor should be moved. Otherwise it would present a traffic hazard, particularly after dark, since Hohman had no way of knowing when the compressor might be picked up again. Approximately fifty feet from where the compressor was sitting was what is described as a "turn around area" and Hohman felt that it would be best to move the compressor to that area where the roadway was wider.
 
 
 9
 Hohman, with the assistance of two of his co-workers, proceeded to push the compressor down the gravel roadway to the site where they intended to leave it. The compressor had a "tongue" on it at the end of which is a small wheel and a trailer hitch. Hohman was lifting and pushing at the tongue end of the compressor and the other two men were on the sides. The compressor hit a ridge of gravel which stopped its forward motion. Plaintiff and his two co-workers backed up the compressor, straightened it out, and took another run at the gravel ridge, and this time when the compressor hit the ridge the tongue bounced up into the air and plaintiff was knocked to the ground. He suffered a dislocated shoulder and later learned that he also had a torn rotator cuff.
 
 
 10
 On the issue of negligence, the only other relevant facts are that the compressors of this nature are sometimes moved by being towed by a truck, are sometimes lifted by crane onto a flatbed truck, are sometimes towed by linking a chain through the hitch on the trailer and attaching it to a truck bumper, and, not infrequently, are moved by hand just as the plaintiff and his co-workers were doing at the time of the accident.
 
 
 11
 From these facts, plaintiff's theory of negligence is that the compressor should not have been left in the middle of the roadway where it was a potential vehicular hazard; he should not have been left with the responsibility of moving the compressor when he had no proper equipment to move it; and the Railway should not have condoned moving this heavy piece of equipment by hand without at least providing some guidance as to the appropriate way that it should be done.
 
 
 12
 In the interrogatories that were submitted to the jury, the jury was instructed that if they found any negligence on the part of the Railway they were to specifically detail what that negligence was. In response, the jury indicated, inter alia: "1) leaving compressor in road 2) not providing hitch and/or roadblock equipment 3) lack of radio in truck 4) lack of regularly scheduled in-dept. safety training...."
 
 
 13
 Although the Railway makes a number of arguments as to why none of this conduct was negligent, we conclude that there was sufficient evidence presented from which the jury could properly concluded as they did that it was foreseeable that this compressor would have to be moved and that the only way Hohman and the other workers could move it would be by hand. The fact that the jury concluded that condoning the indiscriminate moving of compressors weighing over a ton by hand without any particular safety rules applying to such conduct was negligence is a conclusion that the district court properly declined to overrule.
 
 
 14
 We emphasize again that this is not a case of patently unreasonable or grossly negligent conduct on the part of the Railway. Rather, this constitutes the "however slight" negligence that is necessary for a recovery under the FELA.
 
 
 15
 In a similar vein, we cannot say that the jury reached an inappropriate conclusion when they found that the plaintiff acted reasonably and with due regard for his own safety in making the decision that the compressor had to be moved for safety sake and in the manner in which he decided to move it. We find it quite believable as testified to by the crew members that had they called back to the home yard and asked the Railway to send out a truck to move the trailer fifty feet, the response would have been negative.
 
 III.
 
 16
 We next consider the question of damages. Although this case is somewhat remarkable with regard to the specificity that the jury was required to furnish in connection with reaching its verdict, the bottom line on damages is that it was an undifferentiated verdict. In other words, the jury was not asked to break down its damage award into the various categories recoverable, such as wage loss, future wage loss, and pain and suffering. As a result, there is little that we can do with defendant's claim that there was inadequate evidence on the issue of future pain and suffering. It is unclear from the jury verdict what amount was actually awarded for future pain and suffering, although the amount of the award would indicate that something was given for this category of damage.
 
 
 17
 In any event, the plaintiff did offer testimony that the torn rotator cuff was a permanent disabling injury, that it was to his dominant arm, that he would not be able to do the type of work he had done all his life as a result of it, and that he suffered both emotional and physical consequences as a result of the loss of use of his arm. Although there was minimum specificity as to any description of the precise nature of the pain and suffering that would continue into the future, it is clear that even the social and emotional ramifications which existed would be an adequate basis on which to bottom an award for future pain and suffering.
 
 
 18
 The future wage loss issue presents a more difficult question. Plaintiff presented testimony on what he made his last full year of employment and the number of years that he would continue to work. Although the plaintiff was eligible to work until he was seventy, in a refreshing bit of candor, he testified that he had only intended to work until he was sixty-five and only claimed future wage loss up to that point in time. So far so good. The problem comes with the rather imprecise way in which the plaintiff went about establishing the actual monetary amount of the future wage loss. In his last year of employment, the plaintiff earned approximately $18,000 and, with fringe benefits, his total salary package was worth in the neighborhood of $23,000 or $24,000. Plaintiff and his counsel worked up a series of figures relative to future wage loss which provided the jury with three separate alternatives. The first series was figured at an annual wage rate of $20,000 a year, another was figured at $25,000 a year, and the third was figured at $30,000 per year. The only testimony that was arguably supportive of these different salaries would relate to the salary in the $20,000 to $25,000 bracket. There was really nothing to indicate how a salary of $30,000 might have been arrived at. The plaintiff did have an economist testify but the economist's testimony was limited solely to discounting the three alternative salary figures presented by the plaintiff to their present value as is required by the applicable jury instruction.[2]
 
 
 19
 Here again the problem is there is no way to tell what amount the jury actually came back with insofar as future wage loss is concerned. Although the plaintiff's testimony was admittedly thin, defendant, following what all too often is the conventional and probably erroneous wisdom, presented nothing at all on the question of damages. Once the jury determined that the plaintiff was entitled to damages, the only testimony that they had to work from was that provided by the plaintiff.[3] Under such circumstances, we are not prepared to say that the trial judge erred in refusing to order a new trial on the issue of damages or to order a remittitur. Our own view of the damages is that they are on the high side, but they are not such as to shock the conscience and require us to substitute our judgment for that of the jury and trial court.
 
 IV.
 
 20
 Defendant's last argument is that plaintiff's counsel committed error in the rebuttal portion of his closing argument. Specifically, this concerns a comment relating to an automobile accident in which the plaintiff was involved subsequent to his work-related accident. The defendant had brought out the fact of this subsequent accident on cross-examination. Although the fact of the accident was brought out, nothing was brought out with any real specificity concerning the nature of plaintiff's injuries, if any, resulting from this subsequent accident. In his closing argument, plaintiff's counsel made one brief reference to this part of the trial. Plaintiff's counsel stated: "The auto accident. He wasn't injured in the auto accident. There has been no testimony. He never put in a claim for a penny from any furniture truck for anything." This statement was objected to and the objection was sustained. Although we believe that the plaintiff's counsel statement to the effect that plaintiff was not injured in the subsequent auto accident was improper, we further conclude, however, that his statement that there was no testimony offered by the defense as to any injuries that the plaintiff sustained is an accurate one. On balance, we cannot say that this statement was of a type that contaminated the trial. Here again we note that it was the defendant that chose to deal in innuendo as opposed to offering proofs on the issue of damages.
 
 
 21
 AFFIRMED.
 
 
 
 *
 Honorable Ronald E. Meredith, United States District Court, Western District of Kentucky, sitting by designation
 
 
 [1]
 45 U.S.C. Sec. 51 reads in pertinent part as follows:
 Every common carrier by railroad while engaging in commerce between any of the several States or Territories, ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.
 
 
 [2]
 We note that in closing arguments plaintiff's counsel only argued to the jury that they should return a verdict based on the $20,000 per year figure for the rest of plaintiff's work life. Specifically, plaintiff's counsel asked for $101,000 which is the $20,000 per annum figure reduced to its present value as testified to by the economist
 
 
 [3]
 In his closing argument to the jury, plaintiff's counsel stated:
 We said reduce it. That is a hundred one thousand dollars, a hundred one thousand dollars. We calculated, by the way, $50 a day for the rest of his life, $319,375, plus the $101,000, the losses figure on this page. It comes out to $420,381.
 It is not surprising that the jury brought back almost the exact numbers that plaintiff's counsel gave them to work with because they had no other numbers before them.